# Matter of S-E-M-Z-, Applicant

*Decided June 5, 2026*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

The "social distinction" element of a particular social group must generally be measured on a countrywide basis, rather than from the perspective of a neighborhood or other limited geographic location within a country.

FOR THE APPLICANT:  Jarom J. Yates, Esquire, Dallas, Texas

FOR THE DEPARTMENT OF HOMELAND SECURITY:  Stacy Norcross, Assistant Chief Counsel

BEFORE:  Board Panel:  MALPHRUS, Chief Appellate Immigration Judge; GEMOETS, Appellate Immigration Judge; MCCLOSKEY, Temporary Appellate Immigration Judge.

GEMOETS, Appellate Immigration Judge:

The Department of Homeland Security ("DHS") appeals from an Immigration Judge's March 5, 2019, decision granting the applicant's request for withholding of removal pursuant to section 241(b)(3) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(b)(3) (2018). The applicant opposes the appeal. The appeal will be sustained, and the record will be remanded.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The applicant is a native and citizen of Honduras who is in withholding-only proceedings. In October 2016, MS-13 gang members attempted to recruit the applicant's daughter to sell drugs on their behalf, be a prostitute, and otherwise further their criminal enterprise. They threatened to kill the applicant because she opposed her daughter's recruitment.

The applicant's daughter was kidnapped in October 2016. The applicant, her nephew, and a young man were able to locate the applicant's daughter. The nephew then drove the applicant and her daughter to a rural village where the applicant's mother lived. Strangers who were perceived as gang members arrived at the village asking about the applicant. The applicant and her daughter then left Honduras for the United States. The nephew who helped locate the applicant's daughter was found murdered thereafter.

The Immigration Judge concluded that the applicant experienced past persecution in Honduras on account of her membership in a family-based particular social group, that Honduran authorities were unable or unwilling to protect her, and that DHS did not rebut the resulting regulatory presumption that her life or freedom would be threatened in the future in Honduras for the same reason.

## II. ANALYSIS

### A. Membership in a Particular Social Group

DHS argues that the applicant's family-based particular social group is not cognizable. For the following reasons, we agree.[1]

A legally cognizable particular social group requires immutable characteristics, must be defined with particularity, and must be socially distinct within the society in question. *Matter of W-G-R-*, 26 I&N Dec. 208, 212–18 (BIA 2014), *vacated in part on other grounds sub nom., Reyes v. Lynch*, 842 F.3d 1125 (9th Cir. 2016). In *Matter of L-E-A- II*, the Attorney General held that an applicant's immediate family "generally will not be distinct on a societal scale, whether or not it attracts the attention of criminals who seek to exploit that family relationship in the service of their crimes." 27 I&N Dec. at 582. In order "to qualify under the statute and Board precedent, when an applicant proposes a group composed of a specific family unit, he must show that his proposed group has some greater meaning in society." *Id.* at 594. "It is not enough that the family be set apart in the eye of the persecutor, because it is the perception of the relevant society—rather

---

[1] In finding that the particular social group was cognizable, the Immigration Judge expressly relied on our decision in *Matter of L-E-A-*, 27 I&N Dec. 40 (BIA 2017) ("*L-E-A- I*"). In that case, we held that "family ties may meet the requirements of a particular social group depending on the facts and circumstances in the case." *Matter of L-E-A- I*, 27 I&N Dec. at 42. During the pendency of this appeal, the Attorney General overruled *Matter of L-E-A- I*. *Matter of L-E-A-*, 27 I&N Dec. 581 (A.G. 2019) ("*L-E-A- II*"). That decision, in turn, was overruled for a time by *Matter of L-E-A-*, 28 I&N Dec. 304 (A.G. 2021) ("*L-E-A- III*"). However, the Attorney General recently vacated *Matter of L-E-A- III* and instructed adjudicators to adhere to the holding of *Matter of L-E-A- II* in all pending and future claims. *Matter of R-E-R-M- & J-D-R-M-*, 29 I&N Dec. 202, 205 (A.G. 2025). Accordingly, we analyze this claim through the holding of *Matter of L-E-A- II*. The same applies to the Attorney General's decisions in *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018) ("*A-B- I*"), and *Matter of A-B-*, 28 I&N Dec. 199 (A.G. 2021) ("*A-B- II*"). *See Matter of S-S-F-M-*, 29 I&N Dec. 207 (A.G. 2025) (reinstating *Matter of A-B- I* and *Matter of A-B- II*).

than the perception of the alien's actual or potential persecutors—that matters." *Id.*

In determining that the applicant established a valid family-based particular social group, the Immigration Judge found that people within Honduran neighborhoods know each other and are highly familiar with the details of families within those neighborhoods. While this finding is grounded in the record and is not clearly erroneous, the Immigration Judge erred by focusing on a specific neighborhood to determine the concept of social distinction, instead of the relevant society at large. "The fact that nuclear families or some other widely recognized family unit generally carry societal importance says nothing about whether a *specific* nuclear family would be recognizable by society at large." *Matter of L-E-A- II*, 27 I&N Dec. at 594 (citation modified). An immediate family must carry "greater societal import" in order to meet the social distinction requirement. *Id.* at 595. We recognize that neighbors within a limited geographic and residential area may be known to each other; however, such recognition does not establish that, for asylum and withholding of removal claims and in the case of a specific family, such family unit is recognized as separate and distinct by society at large. Adherence to this scope of inquiry is consistent with the concept of a refugee as being unable to return to a country as opposed to a solitary neighborhood or limited geographic location within such country. INA § 101(a)(42); 8 U.S.C. § 1101(a)(42) (2018).

Our prior precedents do not support the conclusion that social distinction can be measured from the perspective of a neighborhood. We first addressed the definition of "particular social group" in *Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985), *overruled on other grounds by Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987). In *Matter of Acosta*, we held that members of such a group must "share a common, immutable characteristic." *Id.* at 233. As this case focused on the concept of immutability, we had no reason to explicitly address how a relevant society perceives a claimed particular social group. However, we emphasized the significance of fear-based protection that "a refugee must be unable or unwilling to return to a particular 'country.'" *Id.* at 235 (citing INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A)). "[A]n alien seeking to meet the definition of a refugee must do more than show a well-founded fear of persecution in a particular place or abode within a country—he must show that the threat of persecution exists for him *country-wide*." *Id.* (emphasis added).

In subsequent cases, we focused, among other matters, on society's perception, using varying terms to describe this requirement. For example, we noted the "*distinct and recognizable* clans and subclans in Somalia."

*Matter of H-*, 21 I&N Dec. 337, 343 (BIA 1996) (emphasis added).  In *Matter of C-A-*, 23 I&N Dec. 951, 959–60 (BIA 2006), *aff'd sub nom., Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190 (11th Cir. 2006), we held that "'visibility' is an important element in identifying the existence of a particular social group" and for such group's recognizability.  We concluded that "noncriminal informants working against the Cali drug cartel" in Colombia were not a particular social group in part because the group was not visible to the society in question.  *Id.* at 961.

We later stated that "[w]hether a proposed group has a shared characteristic with the requisite 'social visibility' must be considered in the context of the country of concern and the persecution feared."  *Matter of A-M-E- & J-G-U-*, 24 I&N Dec. 69, 74 (BIA 2007*), aff'd sub nom., Ucelo-Gomez v. Mukasey*, 509 F.3d 70 (2d Cir. 2007).  We subsequently clarified that the term "'visibility' unintentionally promoted confusion."  *Matter of W-G-R-*, 26 I&N Dec. at 216.  We thus renamed "that requirement 'social distinction' to clarify that social visibility does not mean 'ocular' visibility— either of the group as a whole or of individuals within the group—any more than a person holding a protected religious or political belief must be 'ocularly' visible to others in society."  *Id.*  In a companion case, we held that "a group's recognition for asylum purposes is determined by the perception of the society in question, rather than by the perception of the persecutor."  *Matter of M-E-V-G-*, 26 I&N Dec. 227, 242 (BIA 2014).  We have applied this framework ever since.  *See also Matter of A-B- I*, 27 I&N Dec. at 336 ("But the key thread running through the particular social group framework is that social groups must be classes recognizable by society at large.").

In asylum and withholding of removal claims, consideration of a particular social group designation is constricted to the applicant's relevant society and the past harm experienced and prospective harm feared therein.  This reference to society must be viewed within its statutory context of nationwide persecution, which is a fundamental aspect of fear-based relief.  As noted in *Matter of Acosta*, "inherent in refugee status is the concept that an individual requires international protection because his country of origin or of habitual residence is no longer safe for him."  19 I&N Dec. at 235; *accord* INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A) (establishing that for withholding of removal under the INA, "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened *in that country* because of the alien's race, religion, nationality, membership in a particular social group, or political opinion") (emphasis added).  *See generally Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (looking "to the language itself, the specific

context in which that language is used, and the broader context of the statute as a whole").

Additionally, the regulations specifically require adjudicators to determine whether applicants can reasonably relocate within their country. 8 C.F.R. §§ 1208.13(b), 1208.16(b) (2020); *see Matter of D-I-M-*, 24 I&N Dec. 448, 449–51 (BIA 2008) (discussing the relevant regulatory framework for asylum eligibility). In this regard, adjudicators must deny asylum in the exercise of discretion, even if an applicant has established past persecution on account of a protected ground, if DHS can establish that the "applicant could avoid future persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the applicant's country of last habitual residence, and under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. § 1208.13(b)(1)(i)(B).

A focus on whether a proposed group is socially distinct within a neighborhood or other limited geographic location within a country is inconsistent with the purpose of nationwide protection contemplated by asylum and statutory withholding of removal. Merely focusing on a limited geographic location begs the question of why that group is not distinct amongst a larger population. It would be anomalous to conclude that a particular social group is socially distinct within a single neighborhood, without consideration of the group's distinction amongst the broader society. By comparison, claims that may arise from religion or political opinion, separate and distinct protected grounds, are not limited by a small geographic location of identity or mistreatment, but considered in the context of nationwide harm.

"[T]he requirements for 'membership in a particular social group' are consistent with the other grounds of persecution, [and] the overall burdens are equivalent to those placed on applicants asserting claims based on the other grounds." *Matter of M-E-V-G-*, 26 I&N Dec. at 244. We have long held that an asylum claim based on nongovernmental action is not "adequately established where the evidence the respondent presents is directed to so local an area of his country of nationality." *Matter of Fuentes*, 19 I&N Dec. 658, 663 (BIA 1988). We also have held that "a political opinion under the INA must be tethered to an expression of a belief or conviction regarding a discrete cause related to the government *of a country*, or . . . a de facto government." *Matter of D-G-E-A- & N-G-G-E-*, 29 I&N Dec. 570, 575–76 (BIA 2026) (emphasis added). It would render the concept of social distinction meaningless if review is limited to a minimal geographic location where neighbors are familiar with one another but lack that similar familiarity outside the location within their country.

As in this case, treating a neighborhood or other limited geographic location as the relevant society for the social distinction inquiry is inconsistent with the INA's focus on countrywide persecution. It is also inconsistent with the well-established principle that an asylum applicant "must show that the threat of persecution exists for him country-wide." *Matter of Acosta*, 19 I&N Dec. at 235. As noted, adjudicators cannot grant asylum without considering whether relocation within the country is reasonably possible. *See, e.g.*, 8 C.F.R. § 1208.13(b)(1)(i). Accordingly, we conclude that social distinction must generally be measured on a countrywide basis, rather than from the perspective of a neighborhood or other limited geographic location within a country.

Circuit court decisions routinely refer to a nation's society. *See Amezcua-Preciado v. U.S. Att'y Gen.*, 943 F.3d 1337, 1344 (11th Cir. 2019) ("Further, nothing in the country conditions evidence indicates that Amezcua-Preciado's proposed social group is socially distinct within Mexican society."); *Rivera-Barrientos v. Holder*, 666 F.3d 641, 653 (10th Cir. 2012) ("Rivera Barrientos has offered no evidence to suggest that Salvadoran society considers young women who have resisted gang recruitment to be a distinct social group."); *Conde Quevedo v. Barr*, 947 F.3d 1238, 1243 (9th Cir. 2020) ("Nor, critically, does any of those documents assert that Guatemalan society *recognizes* those who, without more, report gang violence as a distinct group."); *Lemus-Coronado v. Garland*, 58 F.4th 399, 402 (8th Cir. 2023) ("We agree with the [Board] that [the applicant] has failed to demonstrate that 'witnesses who cooperate with law enforcement' is recognized as a socially distinct group within Guatemalan society and thus deny the petition."); *Zaldana Menijar v. Lynch*, 812 F.3d 491, 500 (6th Cir. 2015) ("Like Zaldana's documentary evidence, his proffered testimony fails to undermine the agency's conclusion that 'active and long-term former gang members' lacked the requisite social distinction within Salvadoran society."); *Gonzales-Veliz v. Barr*, 938 F.3d 219, 232 (5th Cir. 2019) ("Gonzales-Veliz has similarly failed to explain how Honduran society views women unable to leave their relationship as a socially distinct group."); *Morales v. Garland*, 51 F.4th 553, 557–58 (4th Cir. 2022) ("It is not enough that members of the proposed group see themselves as socially distinct. What matters is the view of Salvadorean society as a whole."); *S.E.R.L. v. Att'y Gen. U.S.*, 894 F.3d 535, 556–57 (3d Cir. 2018) ("S.E.R.L. fails to direct us to anything in the record . . . that would compel the conclusion that Honduran society perceives immediate family members of women who cannot leave domestic relationships as constituting a socially distinct group."); *Quintanilla-Mejia v. Garland*, 3 F.4th 569, 590 (2d Cir. 2021) ("While [there] may be some evidence that the Salvadoran [G]overnment views former gang members as socially distinct—at least to the extent that

they were the primary beneficiaries of the tattoo-removal program—it does not compel the conclusion that Salvadoran society as a whole viewed gang members who participated in the program as socially distinct."); *Espinoza-Ochoa v. Garland*, 89 F.4th 222, 235 (1st Cir. 2023) ("We leave it to the [Board] to decide in the first instance whether Espinoza-Ochoa's social group is socially distinct in Guatemalan society, consistent with this opinion."). These cases include countries with large, diverse populations and geographic footprints, as well as smaller, less-populated countries. They do not indicate that a neighborhood can be a relevant society for measuring social distinction.

We acknowledge that some of our language has referenced concepts smaller than a national scope. For example, we have stated that "the shared characteristic of the group should generally be recognizable by others in the community . . . ." *Matter of A-M-E- & J-G-U-*, 24 I&N Dec. at 74. We also have noted that "[p]ersecution limited to a remote region of a country may invite an inquiry into a more limited subset of the country's society, such as in *Matter of Kasinga*, [21 I&N Dec. 357, 366 (BIA 1996)], where we considered a particular social group within a tribe." *Matter of M-E-V-G-*, 26 I&N Dec. at 243. The United States Court of Appeals for the Tenth Circuit has stated that "social visibility requires that the relevant trait be potentially identifiable by members of the community, either because it is evident or because the information defining the characteristic is publically accessible." *Rivera-Barrientos*, 666 F.3d at 652. However, none of these cases holds that a neighborhood or other limited geographic location within a country constitutes a society for purposes of social distinction.

A proposed "social group must avoid, consistent with the evidence, being too broad to have definable boundaries and too narrow to have larger significance in society." *Matter of A-B- I*, 27 I&N Dec. at 336. Focusing on too narrow a subset of society runs the risk that the proposed group will lack that larger significance to society. An alien can establish social distinction through "[e]vidence such as country conditions reports, expert witness testimony, and press accounts of discriminatory laws and policies, historical animosities, and the like [that] may establish that a group exists and is perceived as 'distinct' or 'other' in a particular society." *Matter of M-E-V-G-*, 26 I&N Dec. at 244. If a characteristic is recognizable to a community, but is not necessarily recognizable beyond it, it is incumbent on the applicant to cogently show how such a characteristic makes that group socially distinct within the meaning of the INA.

The applicant's proposed family social group falls within this requirement. The family may have significance within the respective

neighborhood in which the family resides or to the alleged persecutors. However, there is insufficient evidence that this family carries greater significance within Honduran society.

## B. Nexus

We also reverse the Immigration Judge's nexus determination. *See Matter of M-E-V-G-*, 26 I&N Dec. at 242 (noting the importance of distinguishing between the inquiry into whether a group is a "particular social group" and whether a person is persecuted "on account of" membership in a particular social group). Even if the immediate family here were determined to constitute a valid social group, there is no nexus between it and the harm asserted here. "An asylum applicant's membership in a family-based particular social group does not necessarily mean that any harm inflicted or threatened by the persecutor is because of, or on account of, the family membership." *Matter of L-E-A- I*, 27 I&N Dec. at 43. "If the persecutor would have treated the applicant the same if the protected characteristic of the family did not exist, then the applicant has not established a claim on this ground." *Id.* at 43–44.

The Attorney General has adopted the test set forth in *Matter of L-E-A- I* for determining nexus in cases of possible mixed motives. "To establish the necessary nexus, the protected ground: (1) must be a but-for cause of the wrongdoer's act; and (2) must play more than a minor role—in other words, it cannot be incidental or tangential to another reason for the act." *Matter of A-B- II*, 28 I&N Dec. at 208–09 (citing *Matter of L-E-A- I*, 27 I&N Dec. at 43–44).

The federal courts have generally been receptive to *Matter of L-E-A- I*'s nexus analysis. For example, the Second Circuit has expressly quoted it. *Garcia-Aranda v. Garland*, 53 F.4th 752, 757 (2d Cir. 2022). "[T]he fact that a persecutor has threatened an applicant and members of his [or her] family does not necessarily mean that the threats were motivated by family ties." *Id.* (alteration in original) (quoting *Matter of L-E-A- I*, 27 I&N Dec. at 45). "Instead, because membership in the family cannot be a minor, incidental, or tangential reason for the harm, 'the fact that a persecutor targets a family member simply as a means to an end is not, by itself, sufficient to establish a claim, especially if the end is not connected to another protected ground.'" *Id.* (quoting *Matter of L-E-A- I*, 27 I&N Dec. at 44–46). The court further collected cases from other circuits adopting a substantially similar standard. *Id.* at 757 n.4 (citing *Thayalan v. Att'y Gen. of U.S.*, 997 F.3d 132, 142–44 (3d Cir. 2021); *Orellana-Recinos v. Garland*, 993 F.3d 851, 856–59 (10th Cir. 2021); *Sanchez-Castro v. U.S. Att'y Gen.*, 998 F.3d 1281, 1286–88

(11th Cir. 2021); *Fuentes v. Barr*, 969 F.3d 865, 871–72 (8th Cir. 2020)).[2] The Ninth Circuit has expressly adopted the test from *Matter of A-B- II* as one way of establishing nexus, with the other being "whether the motive arising from a protected ground was sufficient on its own to cause the harm." *Manzano v. Garland*, 104 F.4th 1202, 1207–09 (9th Cir. 2024).

However, the Fourth Circuit has not followed this approach. In the context of analyzing a family-based social group claim, the Fourth Circuit concluded that a mother's relationship to her son was why she, and not another person, was targeted. *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949–50 (4th Cir. 2015). Both the Attorney General and the Eleventh Circuit have concluded that this analysis as inconsistent with the REAL ID Act's central reason test. *See Matter of A-B- II*, 28 I&N Dec. at 209 ("Even if the protected characteristic is only used opportunistically, the Fourth Circuit appears to believe that a causal relation is sufficient to establish nexus as a matter of law."); *Sanchez-Castro*, 998 F.3d at 1287 ("We decline to follow this reasoning because it expands the nexus inquiry to include family status as a central reason even when it is incidental and subordinate to another reason for harm." (citation modified)).

The Immigration Judge found that the gangs initially targeted the applicant's daughter for recruitment but then targeted the applicant because she was the mother of that daughter. Under the framework of *Matter of L-E-A- I* and *Matter of A-B- II*, this conclusion is incorrect. Even if the family ties provide a "but-for" causation for harm to the applicant, the goals of recruitment and sustaining the gang's power and control are the only central reasons for harm in this case.

We have stated that "nexus is not established simply because a particular social group of family members exists and the family members experience harm." *Matter of L-E-A- I*, 27 I&N Dec. at 45. "This is why the Board established a two-pronged test for proving nexus: the applicant's protected status must be *both* a but-for cause of her persecution *and* it must play more than a minor role that is neither incidental nor tangential to another reason

---

[2]   While the Third Circuit generally adopts this standard, it does not accept our precedents stating that a protected ground cannot be "subordinate" to another reason. *Ndayshimiye v. Att'y Gen. of U.S.*, 557 F.3d 124, 129–31 (3d Cir. 2009); *cf. Matter of J-B-N- & S-M-*, 24 I&N Dec. 208, 214 (BIA 2007) (stating that a protected ground "cannot be incidental, tangential, superficial, or subordinate to another reason for harm"), *aff'd sub nom., Ndayshimiye v. Att'y Gen. of U.S.*, 557 F.3d 124 (3d Cir. 2009).

for the harm or a means to a non-protected end." *Matter of A-B- II*, 28 I&N Dec at 211.

The applicant's expert testified "[a]nything that somehow undermines [the gang's] control is reason to be a target for harm." Gangs utilize several methods, including threats against others, to effect their interest in developing their control. *See, e.g.*, *Matter of M-F-O-*, 28 I&N Dec. 408, 412 (BIA 2021). The applicant's claim that she was and will be persecuted on account of membership in her *immediate* family as a central reason for the harm she fears is undercut by the murder of the nephew who assisted her, which reflects violence against more than immediate family members. This tragic violence reflects that gangs target anyone or anything they see providing a means to achieve compliance with their objectives, without regard to a victim's immediate family status.

The Immigration Judge cited *Hernandez-Avalos*, which arose in a different circuit and, as noted, the Attorney General has stated is inconsistent with the REAL ID Act's central reason test. The Immigration Judge cited, but did not give sufficient consideration to, the in-circuit Fifth Circuit case of *Ramirez-Mejia v. Lynch*, 794 F.3d 485 (5th Cir. 2015). There, "the evidence that gang members sought information from Ramirez-Mejia about her brother, without more, [did] not support her claim that the gang intended to persecute her on account of her family." *Ramirez-Mejia*, 794 F.3d at 493.

The evidence of record is more akin to *Ramirez-Mejia*. As the expert testified, the gangs target anyone who could be a threat to them, and the applicant testified about gangs targeting a wide swath of people. Indiscriminate harm has no nexus to a protected ground. The evidence does not sufficiently establish that "the persecutors had any animus against the family or the [applicant] based on their biological ties, historical status, or other features unique to that family unit." *Matter of L-E-A- I*, 27 I&N Dec. at 47. Any family ties are not a central reason to the harm in this case.

### III. CONCLUSION

Accordingly, the applicant is not eligible for statutory withholding of removal, and we vacate the Immigration Judge's grant of that relief from removal. We need not reach DHS' other arguments regarding that grant of relief. *See INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (per curiam) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach."). The Immigration Judge did not reach the applicant's claim for protection under

the regulations implementing the Convention Against Torture, and we will remand the record solely for that purpose.[3]

**ORDER:** DHS' appeal is sustained, and the Immigration Judge's grant of statutory withholding of removal is vacated.

**FURTHER ORDER:** The record is remanded to the Immigration Court for further proceedings consistent with this decision and for the entry of a new decision.

---

[3] The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85 (entered into force for United States Nov. 20, 1994). 8 C.F.R. §§ 1208.16(c), 1208.17 (2026); 8 C.F.R. § 1208.18(a) (2020).